# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EXXON MOBIL CORPORATION,<br>5959 Las Colinas Blvd.<br>Irving, TX 75039-2298,<br><br>        Plaintiff,<br><br>    v.<br><br>DEPARTMENT OF COMMERCE<br>1401 Constitution Ave., NW<br>Washington, DC  20230,<br><br>and<br><br>ENVIRONMENTAL PROTECTION<br>AGENCY<br>Ariel Rios Building<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460,<br><br>        Defendants. | Civil Action No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This is an action for compliance with the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 522 et seq. and the Administrative Procedure Act (the "APA"), 5 U.S.C. § 701 et seq. Plaintiff also seeks a writ of mandamus and a declaratory judgment pursuant to 28 U.S. C. § 1361 and 28 U.S.C. §§ 2201 and 2202, respectively.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 5 U.S.C. § 552(a)(4)(B) (FOIA), 28 U.S.C. § 1361 (mandamus), and 5 U.S.C. § 701 (APA).

3.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

## THE PARTIES

4.      Plaintiff Exxon Mobil Corporation, a New Jersey corporation, ("ExxonMobil")
made FOIA requests and corresponded regarding the same through its counsel, O'Melveny &
Myers LLP.

5.      Defendant Commerce Department is a Department of the Executive Branch of the
United States Government.  The Commerce Department is an agency within the meaning of 5
U.S.C. § 552(f) and has possession and control of the records at issue in this action.  The
National Oceanic and Atmospheric Administration ("NOAA") is a "Commerce Department
agency."  It "conducts research and gathers data about the global oceans, atmosphere, space, and
sun, and applies this knowledge to science and service that touch the lives of all Americans."
NOAA is comprised of agencies including the National Marine Fisheries Service, "the federal
agency responsible for the stewardship of the nation's living marine resources and their habitat."
*See* Exhibit A ("A Word About NOAA").

6.      Defendant Environmental Protection Agency ("EPA") is a Department of the
Executive Branch of the United States Government.  EPA is an agency within the meaning of 5
U.S.C. § 552(f) and has possession and control of the records at issue in this action.  EPA "leads
the nation's environmental science, research, education and assessment efforts. The mission of
the [EPA] is to protect human health and the environment."  *See* Exhibit B ("About EPA").

## FACTS GIVING RISE TO PLAINTIFF'S CAUSES OF ACTION
### The Reopener Litigation

7.      Plaintiff ExxonMobil and Defendant Commerce Department are parties to a 1991
Agreement and Consent Decree settling the United States of America and State of Alaska's

(collectively, the "Governments") claims against ExxonMobil arising out of the March 24, 1989 oil spill from the T/V Exxon Valdez (the "Spill").   (Agreement and Consent Decree, (the "Agreement"), ¶¶8, 10, attached hereto as Exhibit C).

8.     Under a narrowly-confined provision of the Agreement entitled, "Reopener for Unknown Injury" (the "Reopener"), the Governments could seek additional funds from ExxonMobil under specific circumstances enumerated in the Agreement.  (Agreement, ¶¶17-19).

9.     On May 31, 2006, the Governments submitted a proposal to ExxonMobil to develop and implement a restoration plan under the Reopener ("Claim," attached hereto as Exhibit D).  The parties subsequently entered into a litigation standstill agreement, which is presently in effect between the parties.

10.     The Governments state that the goals of their Claim are:  (1) to determine the locations, approximate amounts, and chemical states of all significant residual deposits of oil from the Spill; and (2) to accelerate the natural processes of degradation and dispersal of the lingering oil through active remediation.  (Claim Cover Letter, at p. 2, attached hereto as Exhibit E).

11.     The Governments' Claim presents the following elements in the development of a restoration plan:  (1) finding the remaining oil; (2) identifying factors limiting natural recovery; (3) evaluating removal technologies; (4) pilot testing of remediation technologies; (5) developing the final restoration plan and environmental assessment of that plan, and (6) implementation of the restoration plan.  (Claim, at p. 1).

12.     The Governments state that one of the tasks of the Claim is "to develop an

efficient method for finding the bulk of the lingering oil.  A probabilistic mapping approach is

presented [in the Claim] to address this task."  (Claim, at p. 3).  The Governments' Claim

presents six steps to develop this model: (1) construct a preliminary probability model from

existing information; (2) design a statistically rigorous sampling plan to guide collection of

additional field data necessary to refine the preliminary probability model; (3) conduct the field

sampling in Prince William Sound ("PWS") and the northern Gulf of Alaska; (4) construct a

refined probabilistic model of the spatial extent of lingering oil; (5) develop and apply criteria to

prioritize beaches with lingering oil for remediation; and (6) continually refine the model

predictions and update the maps using additional field data acquired during remediation.  (Claim,

at p. 7-8).

13.     The Governments' Claim further outlines steps for identifying factors limiting

natural recovery to evaluate whether a bioremediation strategy might be effective.  The

Governments propose to conduct a field study to determine actual oxygen and nutrient

concentrations as a function of tidal cycling and to collect data to support hydrodynamic

modeling of impacted beaches.  The model will be based on hydraulic data gathered from two

beaches within PWS through a tracer study, which will then be used to evaluate candidate

remediation technologies.  (Claim, at p. 10-13).

14.     The Exxon Valdez Oil Spill Trustee Council ("EVOSTC" or "Trustee Council")

consists of the three federal and three state trustees responsible for "oversee[ing] restoration of

the injured ecosystem through the use of the $900 million civil settlement" with ExxonMobil.

*See* Exhibit F ("A State and Federal Partnership").  NOAA is one of the federal trustees.  *See*

Exhibit G ("EVOSTC General Operating Procedures," at II-1).  According to the Trustee

Council's General Operating Procedures, "each Trustee agency is responsible for administrative oversight of projects funded to or through their agencies. This oversight shall include (1) ensuring that the [general operating] procedures . . . and the appropriate state or federal procedures, are followed, including compliance with the National Environmental Policy Act and (2) ensuring that projects funded meet their stated objectives and schedules, and are accomplished consistent with the funds authorized." *Id.* at II-3.

15. On June 1, 2006, the day after the Reopener Claim was submitted, Trustee Council issued an Invitation for Proposals for fiscal year 2007 for a project that would "map distribution and assess patterns of lingering oil remaining in PWS. . . . For example, a project would be considered if it located and mapped remaining lingering oil in the spill area and produced a quantitative estimate of that remaining oil." *See* Exhibit H ("EVOSTC FY07 Invitation for Proposals," at 8-9). The Trustee Council further requested a project that would "investigate the physical and chemical processes that influence the lingering oil in PWS." *Id.* at 9.

### The Michel and Boufadel Projects

16. After receiving proposals in response to the Trustee Council's invitation, the Trustee Council approved and NOAA funded Project 070801 entitled "Assessment of the Areal Distribution and Amount of Lingering Oil in Prince William Sound and the Gulf of Alaska" ("Michel Project"). The proposers for the project were (1) Jacqueline Michel of Research Planning, Inc., (2) Jeffrey Short, a (now retired) scientist of Auke Bay Laboratory, a unit of the National Marine Fisheries Service office in Alaska, and (3) Gail Irvine of the United States Geological Survey. The proposers stated in their Detailed Project Description that "[t]his

proposal has direct relevance to the RFP, which stated . . . 'The Council seeks proposals that map distribution and assess patterns of lingering oil. . . .'" *See* Exhibit I ("Michel Detailed Project Description," at 1). The stated objective of the Michel Project matched the objective of the Reopener Claim: "Develop maps showing the probability of lingering oil for the *Exxon Valdez* oil spill in Prince William Sound and the Gulf of Alaska as of 2007 based on a statistically rigorous field sampling program." *See id.* at 2.

17.     The Trustee Council also approved and NOAA and EPA funded Project 070836 entitled "Factors Responsible for Limiting the Degradation Rate of Exxon Valdez Oil in Prince William Sound" ("Boufadel Project"). The proposers for the project were (1) Michel Boufadel of Temple University, (2) Albert Venosa of the Environmental Protection Agency, and (3) Brian Wrenn of Washington University. The proposers stated in their Detailed Project Description that "[t]his proposal addresses the request by the Exxon Valdez Oil Spill Trustee Council (EVOSTC) for proposals that investigate the physical processes that affect the lingering oil in the subsurface intertidal sediments on some beaches in Prince William Sound." *See* Exhibit J ("Boufadel Detailed Project Description," at 3). The stated objective of the Boufadel Project matched the objective of the Reopener Claim: Test the environmental limitations on oil biodegradation rates through tracer studies on beaches in PWS to evaluate the feasibility of bioremediation. *See id.* at 4-5.

18.     The Trustee Council met October 12, 2007 to approve the final portion of the fiscal year 2008 Workplan, which included project amendments and proposals received in response to the Trustee Council's request for updated detailed project descriptions and progress reports. During the Trustees' discussion regarding the spending cap they would adhere to for purposes of project approvals, the Trustees characterized funds spent on lingering oil projects,

such as the Michel and Boufadel Projects, as funds "to be recovered," presumably through the Trustees' Reopener Claim against ExxonMobil.

### The Trustees' Data Policy

19.     The Trustee Council's Data Policy states that "[d]ata acquired under Trustee Council funding is considered public information and, as such, will be made available to the public . . . . Copyright to such data is *owned by the State and/or Federal agencies* sponsoring the project. (*See* EVOSTC Data Policy, at 3, attached hereto as Exhibit K (emphasis added).) Further, the Data Policy states that "originating principal investigator(s) may not unreasonably impede use or publication of archived data, models, or model products. . . ." *Id.* at 4. Contractors must "agree to follow this policy as a condition of receiving funding." *Id.* at 1.

20.     According to the Trustee Council's General Operating Procedures, "[d]uring the course of the project and at its completion, the investigator shall submit metadata ("data about data") and project data according to Trustee Council approved data policies." ("EVOSTC General Operating Procedures," at II-4). Under the Data Policy, "[p]rincipal investigators are required to work with the Trustee Council's Data Management staff to identify and permanently archive datasets (data and metadata) . . . and to submit metadata for such datasets to the Trustee Council's data archive. The data itself must be archived in either the Trustee Council's data archive or in another archive approved by the [Trustee Council's] Data Systems Manager." ("EVOSTC Data Policy," at 2.)

### ExxonMobil's FOIA Requests to NOAA

21.     By letter dated October 29, 2007, counsel for ExxonMobil, pursuant to the FOIA, requested from NOAA all records related to field work conducted for the Michel Project. A copy of this letter is attached hereto as Exhibit L.

22.     NOAA responded by letter dated December 18, 2007, in which NOAA provided

what it characterized as a "full release" of 8 responsive documents, consisting of e-mail updates

from Dr. Michel to Peter Hagen of NOAA from April to July 2007.  A copy of this letter is

attached hereto as Exhibit M.  In the e-mails released in response to ExxonMobil's FOIA

request, Dr. Michel writes that she has "closely coordinated and collaborat[ed] with Dr. Gail

Irvine (USGS) [("Irvine")] and Dr. Jeff Short (NOAA) [("Short")] throughout the

implementation of the field sampling program." ( FY07 3Q Report attached to July 10, 2007 e-

mail to Peter Hagan from Michel, attached hereto as Exhibit N.)  In the same e-mail, Michel

states that she has sent maps to Irvine and Short showing the status of the field samples.  *Id.*  In

addition, the EVOSTC Annual Project Reports dated September 1, 2007 and August 19, 2008

(both attached hereto as Exhibit O) specifically state that Irvine "participated in the first leg of

the field work in the Gulf of Alaska, and that Short "guided [Michel] throughout the model

development and data analysis."  None of that referenced underlying field work data was

released in response to ExxonMobil's FOIA request.

23.     On December 28, 2007, counsel for ExxonMobil sent a follow-up letter to NOAA

requesting the bulk of the missing data from the production -- field notes, site location data,

chain-of-custody forms, site grid sheets, maps, sketches, photographs, and chemical

analyses/data.  A copy of this letter is attached hereto as Exhibit P.  In that letter, ExxonMobil's

counsel noted that NOAA provided no explanation as to the missing data's availability or any

indication that the request had been denied and on what basis.  ExxonMobil further noted the

following excerpts from the produced e-mails that indicated the missing data were available to

NOAA:

- "The samples will be sent to the NOAA Auke Bay Laboratory in mid-August
  (they are currently being held under chain of custody at the USGS offices in

Anchorage).  Dr. Jeff Short will supervise the entry of the samples into the NOAA database management system, generating the split samples to be sent to ExxonMobil, and the chemical analysis of the samples under our project scope. RPI will generate a database with the information requested by ExxonMobil for the split samples."  FY07 3Q Report attached to July 10, 2007 e-mail to Peter Hagen from Jacqui Michel.

- "We have closely coordinated and collaboration (sic) with Dr. Gail Irvine (USGS) and Dr. Jeff Short (NOAA) throughout the implementation of the field sampling program.  We also coordinated a visit by representatives of the Trustee agencies to the field.  We have been generating a map showing the status of the field sampling and the preliminary results in terms of the presence of oil.  These maps have been sent to our collaborators."  FY07 3Q Report attached to July 10, 2007 e-mail to Peter Hagen from Jacqui Michel.

None of that referenced data was released in response to ExxonMobil's request.

24.     In a separate request dated January 16, 2008, counsel for ExxonMobil, pursuant to the FOIA, requested from NOAA the probability model developed for the Michel Project and all data related to the model, including, but not limited to, any preliminary or revised drafts, as referenced in Michel's 2007 Annual Project Report to the Trustee Council.  A copy of this letter is attached hereto as Exhibit Q.

25.     On August 7, 2008, ExxonMobil's counsel received a letter from NOAA indicating that it had "no records responsive to [the] request" for the probability model and related data.  A copy of this letter is attached hereto as Exhibit R.

26.     After another summer shoreline study pursuant to the Michel Project was conducted in 2008, ExxonMobil's counsel lodged another FOIA request to NOAA to retrieve all records related to the Michel Project on October 17, 2008.  A copy of this letter is attached hereto as Exhibit S.  Since the vast majority of Michel data was not previously produced, the October 17 FOIA request was aimed at giving NOAA a third opportunity to produce this missing data, as well as any data that was created after the first request.

27.     In a letter dated January 6, 2009, NOAA enclosed a production of 4 documents

and 1 CD pertaining to the 2007 Michel shoreline study. Although this production contained chain-of-custody forms, a document regarding the sample exchange, 2 laboratory data sheets, and 1 CD of wet weight chemistry data for 21 sediment samples and 5 tissue samples, the vast majority of the Michel data, including all data from 2008, were missing. A copy of this letter is attached hereto as Exhibit T.

28.     On April 2, 2008, counsel for ExxonMobil, pursuant to the FOIA, requested all records from NOAA related to the Boufadel Project. A copy of this letter is attached hereto as Exhibit U.

29.     On July 18, 2008, NOAA released 5 responsive documents, consisting of 4 e-mail updates from Dr. Boufadel to Peter Hagen of NOAA and Boufadel's Annual Project Report to the Trustee Council. A copy of this letter is attached hereto as Exhibit V. One of the produced e-mails indicates that Boufadel will provide "nutrient results" to Peter Hagen at NOAA. (*See* Email from Boufadel to Hagen dated Mar 14, 2008, attached hereto as Exhibit W.) The FOIA production did not contain any field work data or results underlying the Boufadel Project.

30.     After another summer shoreline study pursuant to the Boufadel Project was conducted in 2008, ExxonMobil's counsel lodged another FOIA request to NOAA to retrieve all records related to the Boufadel Project on October 16, 2008. A copy of this letter is attached hereto as Exhibit X. Since the vast majority of Boufadel data was not previously produced, the October 17 request was aimed at giving NOAA another opportunity to produce this missing data, as well as any data that was created after the first request.

31.     In a letter dated November 25, 2008, NOAA responded to the second Boufadel request by stating that "[a] search of agency files revealed no records responsive to [the] request." No explanatory information was provided. A copy of this letter is attached hereto as

Exhibit Y.

## ExxonMobil's FOIA Requests to EPA

32.     On October 29, 2007, counsel for ExxonMobil, pursuant to the FOIA, requested from EPA all records related to the Boufadel Project.  A copy of this letter is attached hereto as Exhibit Z.

33.     On October 29, 2008, EPA released two draft reports and 26 e-mails between Dr. Boufadel and the other project investigators.  A copy of this letter is attached hereto as Exhibit AA.  The FOIA production did not contain any field work data or results underlying the Boufadel Project.

## ExxonMobil's FOIA Appeals

34.     ExxonMobil's counsel submitted FOIA appeals for all six requests pertaining to the Michel and Boufadel Projects.  By letter dated September 5, 2008, counsel submitted a FOIA appeal on behalf of ExxonMobil to the Commerce Department regarding the partial denial letters dated December 18, 2007, August 7, 2008, and July 18, 2008 for the initial set of requests for the Michel data, Michel probability model, and Boufadel data ("Michel and Boufadel Appeal to NOAA," attached hereto as Exhibit BB).  By letter dated November 25, 2008, counsel submitted a FOIA appeal on behalf of ExxonMobil to the EPA regarding the partial denial letter dated October 29, 2008 for the request for the Boufadel data ("Boufadel Appeal to EPA," attached hereto as Exhibit CC).  By letter dated December 10, 2008, counsel submitted a FOIA appeal on behalf of ExxonMobil to the Commerce Department regarding the partial denial letter dated November 25, 2008 for the second request for the Boufadel 2007 and 2008 data ("Boufadel Appeal to NOAA," attached hereto as Exhibit DD).  By letter dated February 5, 2009, counsel submitted a FOIA appeal on behalf of ExxonMobil to the Commerce Department regarding the

partial denial letter dated January 6, 2009 for the third request for the Michel 2007 and 2008 data ("Michel Appeal to NOAA," attached hereto as Exhibit EE). The thrust of ExxonMobil's argument for all of these appeals was that NOAA and EPA's denial of almost the entirety of documents responsive to these requests was in error because, although the documents are maintained by private researchers, the researchers created the data "on behalf of the agencies" and NOAA and EPA exercise "control" over the data such that they constitute "agency records" under FOIA.

35.     The Commerce Department responded by letter dated March 6, 2009, denying ExxonMobil's appeal for the Boufadel data. EPA responded by letter dated March 5, 2009, denying ExxonMobil's appeal for the Boufadel data. In a letter dated April 3, 2009, the Commerce Department denied ExxonMobil's appeal for all data related to the Michel probability model.[1] The Commerce Department also denied in a letter dated April 3, 2009 ExxonMobil's subsequent appeal for the Michel data. Copies of the denial letters are attached hereto as Exhibit FF, Exhibit GG, Exhibit HH, and Exhibit II respectively.

36.     In the Commerce Department's letters denying the three appeals, the Commerce Department maintained that the requested Michel and Boufadel records were not "created or obtained" by NOAA nor was NOAA "in control of [them] at the time the FOIA request is made." *Burka v. Dept. of Health and Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting *Forsham v. Harris*, 445 U.S. 169, 182 (1980)). The Commerce Department contended NOAA does not have access to the requested documents because they were created by independent

---

[1] The Commerce Department only considered the request for the probability model dated January 16, 2008 as timely appealed and therefore declined to rule on the initial requests for the Michel and Boufadel data. *See* Ex. HH. Nonetheless, all Michel data was incorporated into the second request on January 16, 2008 and third request on October 17, 2008. Likewise, all Boufadel data was incorporated into the second request on October 17, 2008. Therefore, there is no dispute that the data at issue for both the Michel and Boufadel Projects fall under timely appeals.

contractors, and thus NOAA has no control over the requested materials. The Commerce Department also asserted that the contracts between the contractors and NOAA do not require Michel and Boufadel to turn over the data to NOAA. The Commerce Department further stated that NOAA has never taken possession of the records sought, nor have NOAA's personnel read or relied upon the data. Finally, the Commerce Department stated that NOAA has not integrated these documents into their record systems or files.

37.     In EPA's letter denying the remaining appeal, EPA maintained that "EPA does not have custody or control over any [Boufadel] field work data. . . ." EPA claimed that the contract with Boufadel (or any other party) was never finalized or signed. EPA further asserted that it does not possess and has never possessed the field work data.

### Communications with the Trustee Council and NOAA's Designee

38.     Craig O'Connor is Special Counsel for NOAA and represents the agency in both the Reopener matter and as NOAA's designated Trustee Council member with responsibility to oversee EVOSTC-funded projects.

39.     On December 9, 2008, counsel for ExxonMobil met with Craig O'Connor and other Trustee representatives to discuss the Reopener Claim. During that meeting, ExxonMobil raised the issue of the difficulty in properly assessing the validity of the Claim as a result of its inability to obtain data responsive to FOIA requests seeking the scientific data that the Governments allege supports their Reopener Claim. During the meeting, Craig O'Connor and other Trustee representatives pledged to make sure that, at a minimum, ExxonMobil was given fair responses and productions to its outstanding FOIA requests.

40.     Counsel for ExxonMobil has sent numerous letters to Craig O'Connor, copying other Trustee representatives, requesting the promised assistance to ensure compliance with the

FOIA requests. These letters have largely been ignored, resulting in either continued delays in the FOIA process or subsequent denials of ExxonMobil's administrative appeals.

41.     In a letter dated December 12, 2008 to Craig O'Connor, copying other Trustee representatives, counsel for ExxonMobil prioritized the outstanding FOIA requests and appeals, including those for the Michel and Boufadel data. Counsel for ExxonMobil noted that eleven (11) of its outstanding FOIA requests had not been completely processed (many of which were noted in its last letter to Craig O'Connor dated December 11, 2007, to which ExxonMobil never received a response) and twelve (12) requests had been unjustifiably denied by the federal trustee agencies. A copy of this letter is attached hereto as Exhibit JJ. As of the date of this complaint, no response has been received to this letter.

42.     In a follow-up letter dated December 30, 2008 to Craig O'Connor, copying other Trustee representatives, counsel for ExxonMobil noted that it continued to experience delays and obstructive responses by the federal trustee agencies to its outstanding FOIA requests. In particular, ExxonMobil documented a pattern of delay and obstruction with respect to requests for the Boufadel data. A copy of this letter is attached hereto as Exhibit KK. As of the date of this complaint, no response has been received to this letter.

43.     In a follow-up letter dated January 26, 2009 to Craig O'Connor, copying other Trustee representatives, counsel for ExxonMobil stated that it recently received a handful of data (chain-of-custody forms, a document regarding the sample exchange, 2 lab data sheets, and 1 CD of wet weight chemistry data for 21 sediment samples and 5 tissue samples) from NOAA in response to its second request for the Michel data. A copy of this letter is attached hereto as Exhibit LL. As noted in the letter, Craig O'Connor had directly reviewed the data on behalf of NOAA and approved it for disclosure. ExxonMobil further noted that almost all of the data from

Michel's two-year study was missing from the production, including: all of the data from the 2008 shoreline study; the Michel probability model; planning documents; field sketches of sites complete with GPS location; trench sketches and log sheets; site and trench photos; ShoreZone photos used (Michel's 2008 Annual Report stated she would use these to modify her analysis); field notebooks; digital GIS files with ESI, shoreline oiling, selection criteria, etc.; table that correlates the sample field IDs with the ABL lab sample IDs; and field data on the 5 tissue analyses, including species. ExxonMobil requested a response to this letter by February 2, 2009. No response was received, and ExxonMobil appealed the request on February 5, 2009. That appeal was subsequently denied. As of the date of this complaint, no response has been received to this letter.

44.     Although Drs. Michel and Boufadel had been scheduled and approved to present their project findings at the January 19-23, 2009 Alaska Marine Science Symposium, the Trustees withdrew their presentation from the Symposium. During the public comment portion of the January 16, 2009 EVOS Trustee Council meeting, Scott Pegau with the Oil Spill Recovery Institute in Cordova, a member of the committee which set the presentation agenda for the Symposium, asked why the Trustees were "suppressing" research results by withdrawing approved presentations. Craig O'Connor responded that "the materials and results were not ready for presentation" and when they were finished, they will be presented. Pegau further commented that it was highly unusual for the funders to decide when projects are ready for presentation when the researchers think otherwise.

45.     In a letter dated October 12, 2009 to Craig O'Connor, copying other Trustee representatives, counsel for ExxonMobil requested that the Trustees agree to produce the Michel and Boufadel data by the end of October. A copy of the letter is attached hereto as Exhibit MM.

As of the date of this complaint, no response from O'Connor has been received to this letter.

## Statements by the Trustee Council and NOAA's Designee

46.     At the November 18, 2009 Trustee Council meeting, O'Connor publicly admitted that he had read the Michel and Boufadel project reports and the Trustees will rely on the reports to initiate the process of preparing a supplemental Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA").

47.     On January 6, 2010, NOAA released a Notice of Intent to Prepare a Supplemental Environmental Impact Statement ("Notice of Intent") on the Trustee Council's restoration efforts pursuant to NEPA.  A copy of the Notice of Intent is attached hereto as Exhibit NN.  In the Notice of Intent, NOAA publicly admitted that the Trustee Council initiated the Michel and Boufadel Projects "to reach a decision point on further efforts for active remediation . . . and the resolution of the Reopener."

48.     In early January 2010, at the request of O'Connor, Dr. Michel submitted a Lingering Oil Report to the Trustee Council on the results of the Michel and Boufadel studies that ExxonMobil has been denied under FOIA.  A copy of the report is attached hereto as Exhibit OO.  At the Trustee Council meeting on January 13, 2010, O'Connor explained that the Lingering Oil Report was designed to be a composite report regarding where the Trustee Council stands with regard to lingering oil from the Spill.

49.     During the Public Advisory Committee meeting on January 13, 2010, O'Connor stated that the Trustee Council assumed responsibility to address lingering oil from the Spill under the Reopener and specifically commissioned the Michel and Boufadel studies as part of that responsibility.  O'Connor further stated that through these studies, they developed a probabilistic tool to predict the location of lingering oil.  O'Connor explained that they then

examined how to remediate the oil by evaluating the limiting factors to address why the oil is still present.  He further stated that they have determined that oxygen is the limiting factor preventing natural biodegradation from occurring in the field.

50.     During the Public Advisory Committee meeting on January 13, 2010, Laurel Jennings of NOAA stated that NOAA is about to reach the first milestone in the creation of a supplemental EIS.  Jennings stated that the Notice of Intent would be published in the Federal Register, which will then start the scoping process to include public comment and six public meetings.

51.     On January 19, 2010, Dr. Michel presented the results from lingering oil projects to the public at the Alaska Marine Science Symposium.  Despite all of these public statements by the Trustees admitting possession and control over the Michel and Boufadel Projects, no response from O'Connor to ExxonMobil's letters or additional data has been received.

52.     On January 20, 2010, counsel for ExxonMobil submitted another letter to O'Connor requesting that the Trustees reconsider their refusal to release the requested Michel and Boufadel data in light of the admissions that the Governments' lawyers have read the principal investigators' reports on the lingering oil projects and will rely on the reports to initiate the process of preparing a supplemental EIS.  A copy of the letter is attached hereto as Exhibit PP.  No response from O'Connor or additional data has been received.

### Reliance by Albert Venosa of EPA on Michel and Boufadel Projects

53.     Albert Venosa, an EPA researcher, and the original principal investigator (now listed as "assisting personnel") for the Boufadel Project, directly relies upon the Michel and Boufadel results in his own EPA-funded Project 080840 entitled "A Microcosm Study on the Biodegradability of Lingering Oil in Prince William Sound 19 Years After the Exxon Valdez Oil

Spill" ("Venosa Project").  This microcosm study is the third component of the Reopener

lingering oil projects and designed to "complement the current Boufadel *et al.* study on Limiting

Factors."  *See* Exhibit QQ ("Venosa Detailed Project Description," at 5).  According to the

project's abstract, the combined results from Venosa's microcosm study and Boufadel's

"complementary tracer study," in accordance with the Reopener Claim objectives, "will provide

sufficient support to aid the Exxon Valdez Oil Spill Trustee Council in making a decision

regarding the propriety of undertaking an investigation of the applicability of bioremediation in

the field."  *Id.* at 1.

54.     During the May 27, 2009 EVOS Trustee Council Meeting, O'Connor stated that

the consensus among the "lingering oil team together in the context of the Reopener" is that

Venosa's microcosm project is critical to determine whether bioremediation will or will not

work.

55.     In Venosa's 2009 Annual Report (which was posted on the EVOSTC website but

subsequently pulled, noting only that it was "received" by the Trustee Council), Venosa

indicated that he has worked closely with Michel and Boufadel on the three lingering oil projects

and relies and will continue to rely on their sampling and results for his own microcosm study.

A copy of the report is attached hereto as Exhibit RR.  Venosa's project data and results are the

target of another ExxonMobil FOIA request to EPA dated October 17, 2008.  No responsive

documents have been received as of the date of this complaint, despite ExxonMobil granting four

extensions over more than a year.

## COUNT I

### (Violation of the Freedom of Information Act)

56.     Plaintiff incorporates paragraphs 1-55 as if fully set forth herein.

57.     The FOIA requires agencies of the federal government, upon request, to release records to the public.  5 U.S.C. § 552(a).

58.     The term "record," as defined in the FOIA, includes "any information that would be an agency record subject to the requirements of [the FOIA] when maintained by an agency in any format, including an electronic format."  5 U.S.C. § 552(f)(2).  A record "need not be generated by an agency, or in the actual possession of an agency . . . to be considered 'owned or obtained' by an agency."  *In Defense of Animals v. Nat'l Inst. of Health*, 543 F. Supp. 2d 70, 77 (D.C. Cir. 2008).  Data that are neither created by agency employees nor currently housed at the agency are "agency records" under FOIA if a private researcher created the data "on behalf of [the agency]."  *Burka v. U.S. Dept. of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996).  Data are "agency records," where the agency exercises "extensive supervision and control" over the data.  *Id.* at 512, 515.

59.     Pursuant to the FOIA, a requestor may appeal an agency's failure to disclose requested records.  5 U.S.C. § 552(a)(6).

60.     If the agency denies the requestor's request on appeal, the requestor is deemed to have fully exhausted his administrative remedies and may bring suit in federal district court.  5 U.S.C. § 552(a)(6)(C)(i).

61.     Pursuant to 5 U.S.C. § 552(a)(4)(B), a district court has jurisdiction to enjoin a federal agency from withholding information and order the production of any records that have been improperly denied to the requestor.

62.     Defendant agencies have denied Plaintiff's appeals submitted on September 5, 2008, November 25, 2008, December 10, 2008, and February 5, 2009 regarding the Michel and Boufadel data.  Thus, Plaintiff has fully exhausted its administrative remedies on these appeals.

63.     Plaintiff has a right of access to the information and documents requested, and Defendants have no legal basis for refusing to disclose this information and these documents to Plaintiff.  Thus, pursuant to the FOIA, the Court must enjoin the agencies from withholding agency records and order the production of any agency records improperly withheld from the complainant.

## COUNT II

### (Violation of the Freedom of Information Act/Administrative Procedure Act)

64.     Plaintiff incorporates paragraphs 1-63 as if fully set forth herein.

65.     The APA directs that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(a)(2)(A).  The APA further directs that a reviewing court hold unlawful and set aside agency action conducted "without observance of procedure required by law."  *Id.* § 706(a)(2)(D).

66.     The APA requires an agency to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  An agency's decision under the APA must be "based on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

67.     On multiple administrative appeals, Defendant agencies refused to grant access to almost all of the records requested by Plaintiff.  Their refusal constituted final and reviewable agency action pursuant to the FOIA, 5 U.S.C. § 552(a)(6)(C).  Moreover, their refusal lacked rational connection with the facts.

68.     Plaintiff was aggrieved by Defendants' unlawful withholding of the requested documents.

69.     By violating the FOIA, as set forth in paragraphs 56 through 63 above, Defendants have acted arbitrarily and capriciously, not in accordance with law, and without observance of procedure required by law, in violation of the APA.  5 U.S.C. §706(2)(A),(D). Thus the Court, under the APA, must hold unlawful and set aside Defendants' refusal to produce the records requested by Plaintiff.

## COUNT III

### (Violation of the Freedom of Information Act/Mandamus and Venue Act)

70.     Plaintiff incorporates paragraphs 1-69 as if fully set forth herein.

71.     The Mandamus and Venue Act, gives the Court authority to "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

72.     Defendant agencies have a nondiscretionary duty to comply with the requirements of the FOIA including, but not limited to, the requirements set forth in the preceding paragraphs 54 through 56.

73.     Defendant agencies have violated the FOIA, as set forth in paragraphs 56 through 63 above.

74.     Accordingly the Court should exercise its authority pursuant to the Mandamus and Venue Act, to compel Defendants to perform the duties they owe Plaintiff under the FOIA, including the duty to disclose the records Plaintiff requested.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays that the Court:

    A.  Declare that Defendants' withholding of the requested records is unlawful under the FOIA;

B. Pursuant to the FOIA, issue an injunction requiring Defendants to produce the documents requested by Plaintiff;

C. Pursuant to the APA, hold unlawful and set aside Defendants' decisions to not produce the records Plaintiff requested under the FOIA as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law;

D. Enter a writ of mandamus ordering Defendants to comply with the FOIA and the APA, and carry out their nondiscretionary duty to make available the documents requested by Plaintiff within 60 days or be fully barred from future use of any undisclosed data;

E. Award costs and reasonable attorney fees as authorized by the FOIA, 5 U.S.C. § 552(a)(4)(E); and

F. Grant such other and further relief as the Court may deem proper.

Dated: February *16*, 2010

Respectfully submitted,

By _____
Jonathan Hacker

JONATHAN HACKER (D.C. Bar No. 456553)
jhacker@omm.com
CARLA CHRISTOFFERSON
cchristofferson@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:     (213) 430-6000
Facsimile:      (213) 430-6407

Attorneys for Plaintiff EXXON MOBIL
CORPORATION