UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EXXONMOBIL CORPORATION, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 10-250 (RCL) |
| | ) |
| DEPARTMENT OF COMMERCE, *et al.*, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff ExxonMobil Corporation brings this action against defendants Department of Commerce and Environmental Protection Agency under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 791 *et seq.*, challenging defendants' responses to multiple FOIA requests that plaintiff submitted. Plaintiff also seeks a writ of mandamus pursuant to 28 U.S.C. § 1361 and a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202. Before the Court is defendants' Motion [13] for Summary Judgment and plaintiff's Cross-Motion [16] for Summary Judgment. Upon consideration of both Motions, plaintiff's opposition [16] to defendants' motion, defendants' reply [21] in support of their motion and opposition to plaintiff's cross-motion, plaintiff's reply [22], the entire record in this case, and the applicable law, the Court will GRANT defendants' Motion for Summary Judgment and DENY plaintiff's Cross-Motion for Summary Judgment.

## I. BACKGROUND

### A. Exxon Valdez Oil Spill Trustee Council

On March 24, 1989, the oil tanker T/V Exxon Valdez spilled approximately 11 million gallons of crude oil owned by Exxon Corporation into Prince William Sound, Alaska. Compl. Ex. C ("Agreement"). In 1991, plaintiff ExxonMobil ("Exxon") entered into an Agreement and Consent Decree with the United States and the State of Alaska under which Exxon paid the two Governments $900 million in settlement of the Governments' claims against Exxon arising out of the oil spill. Agreement ¶¶ 8, 10; *see United States v. Exxon Corp., et al.*, Nos. 3:91-0082 & 3:91-0083 (D. Alaska). The Agreement provided for the $900 million to be disbursed over a ten-year period, providing compensation for all existing and future natural resource damages, assessment costs, and restoration costs stemming from the spill.

The Exxon Valdez Oil Spill Trustee Council ("Trustee Council") was created in 1992 to oversee the use of these settlement funds for restoration efforts. Defs.' Mot. for Summ. J. Ex. 2 ("Hagen Decl."), ¶ 7; Defs.' Mot for Summ. J. Ex. 3 ("O'Connor Decl."), ¶ 6. The Trustee Council is composed of three State of Alaska trustees and three Federal trustees. Compl. Ex. G. The three Federal trustees are the National Oceanic and Atmospheric Administration ("NOAA"), a component of the Department of Commerce; the Department of the Interior; and the Department of Agriculture. *Id.* Each Trustee agency designates its own representative to serve on the Trustee Council. *Id.* The National Marine Fisheries Services ("NMFS") Alaska Regional Administrator represents NOAA on the Trustee Council and oversees the NMFS Office of Exxon Valdez Oil Spill Damage Assessment and Restoration, which administers projects carried out by NMFS researchers and outside contractors, and facilitates research planning and coordination between EVOS projects and other programs. Hagen Decl. ¶ 8. The Trustee

Council operates by unanimous consent among its trustees and establishes its own policies and procedures consistent with the Agreement to make all decisions related to injury assessment, restoration activities, or other use of the natural resource damage recoveries obtained by the Governments. *Id.* An Executive Director administers the Trustee Council office and oversees the creation of an annual workplan using a competitive process to solicit project proposals. *Id.*; O'Connor Decl. ¶ 7.

Since the settlement in 1991, hundreds of research, monitoring, and general restoration projects have been funded to restore the ecosystem of Prince William Sound and the Gulf of Alaska to its condition prior to the spill. Hagen Decl. ¶ 7; O'Connor Decl. ¶ 6. The Trustee Council does not have independent fiscal authority, so it operates through its Trustee agencies acting on behalf of the Trustee Council to enter into contractual agreements with third parties to implement these projects. Hagen Decl. ¶ 10; O'Connor Decl. ¶ 9. The Trustee council is responsible for soliciting project proposals and administering the proposal process, including the issuance of contract bids for restoration proposals. Hagen Decl. ¶¶ 9–10; O'Connor Decl. ¶¶ 8–9. The bid announcement specifies the restoration actions that are sought and the terms under which the project proposals will be awarded, and the proposals are evaluated by Trustee Council staff, which obtain funding recommendations and develop workplans based on the recommendations. Hagen Decl. ¶¶ 9–10; O'Connor Decl. ¶¶ 8–9.

As one of the implementing agencies of the Trustee Council, NOAA issues a Broad Agency Announcement ("BAA") concurrent with the Trustee Council invitation for proposals. Hagen Decl. ¶ 10; O'Connor Decl. ¶ 9. Interested parties are asked to submit a copy of their proposal to NOAA at the same time that it is submitted to the Trustee Council, but the review,

evaluation, and selection of the proposals are done solely by the Trustee Council. Hagen Decl. ¶ 10; O'Connor Decl. ¶ 9.

Once the Trustee Council unanimously approves a workplan, the U.S. Department of Justice and the State of Alaska Department of Law initiate the process of withdrawing funds from the settlement account and transferring them to the Federal or State agency administering the particular project for distribution to the entity implementing the project. Hagen Decl. ¶ 11; O'Connor Decl. ¶ 10. Funds for projects that are submitted under the BAA are routed to NMFS Alaska Regional office, which works with the NMFS procurement office to obligate those funds and enter into contracts with the third-party entities using the Trustee Council-approved project proposal as the contract statement of work. Hagen Decl. ¶ 11; O'Connor Decl. ¶ 10. To fund these projects, the Trustee Council transfers money from the $900 million settlement account to the implementing agency, such as NOAA. Hagen Decl. ¶ 11; O'Connor Decl. ¶ 10. The work performed by contract awardees is not funded by trustee agency appropriations. Hagen Decl. ¶ 11; O'Connor Decl. ¶ 10.

### B. Restoration Projects 070801 (Michel Study) and 070836 (Boufadel Study)

A provision entitled "Reopener for Unknown Injury" in the 1991 Agreement between ExxonMobil and the Governments allows the governments to seek additional funds from Exxon under specific circumstances enumerated in the Agreement. *See* Agreement ¶¶ 17–19. On May 31, 2006, the Governments submitted a claim to Exxon under the Reopener to develop and implement a restoration plan to accelerate the removal of lingering subsurface oil. Compl. Exs. D, E. The goals of the Reopener Claim are: (1) to determine the locations, approximate amounts, and chemical states of all significant residual deposits of oil from the 1989 spill; and (2) to accelerate the natural processes of degradation and dispersal of the lingering oil through active

remediation. Compl. Ex. E, at 2. The day after the Reopener Claim was submitted, on June 1, 2006, the Trustee Council issued an Invitation for Proposals for fiscal year 2007 for a project that would "map distribution and assess patterns of lingering oil remaining in [Prince William Sound]" and a project that would "investigate the physical and chemical processes that influence the lingering oil in [Prince William Sound]." Compl. Ex. H, at 8–9.

On February 16, 2007, the Trustee Council approved Restoration Project 070801, entitled "Assessment of the Areal Distribution and Amount of Lingering Oil in Prince William Sound and the Gulf of Alaska" ("Michel Study"). Compl. Ex. I. The proposal was submitted by Dr. Jacqueline Michel, of Research Planning, Inc.; Dr. Jeffrey Short, a scientist of Auke Bay Laboratory, a unit of the NMFS Alaska office; and Dr. Gail Irvine, of the United States Geological Survey. *See id.* On March 9, 2007, the Trustee Council also approved Restoration project 070836, entitled "Factors Responsible for Limiting the Degradation Rate of Exxon Valdez Oil in Prince William Sound" ("Boufadel Study"). Compl. Ex. J. The proposal was submitted by Dr. Michel Boufadel, of Temple University; Dr. Albert Venosa, of the EPA; and Brian Wrenn of Washington University. *See id.*

NOAA was the implementing agency for both the Michel and the Boufadel Studies. *See* Hagen Decl. ¶ 3. The Program Manager for the Exxon Valdez Oil Spill Office within the NMFS Alaska Regional Office servied as the Contracting Officer's Technical Representative ("COTR") for both studies. *Id.* ¶¶ 14, 27. Consistent with the Trustee Council's directives, the COTR monitored the performance and progress of the contractors with respect to the statement of work and recommended payment of invoices to the Contracting Officer. *See id.* However, the COTR did not have any supervisory function over the researchers or any substantive involvement in their projects; rather, the COTR's role was limited to the administrative function of monitoring

the progress of the projects for purposes of reimbursing the researchers. *Id.* Under the terms of the contract awards for both projects, quarterly, annual, and final reports are provided directly to the Trustee Council, and the only documents required to be provided to NMFS during the course of the project are cost and progress reports. *See id.* ¶¶ 15, 28.

### C. Plaintiff's FOIA Requests to NOAA

By letters dated October 29, 2007, January 16, 2008, April 2, 2008, October 17, 2008, and October 20, 2008, ExxonMobil submitted FOIA requests to NOAA's headquarters in Silver Spring, Maryland, seeking records related to the Michel Study and the Boufadel Study. *See* Compl. ¶¶ 21–31. Due to the subject matter of the requests, NOAA's FOIA office assigned the requests to the NMFS FOIA headquarters and to NOS. Defs.' Mot. for Summ. J. Ex. 5, ¶ 5. The NMFS FOIA Officer further assigned the requests to the NMFS Alaska Regional office. *Id.* ¶ 5–6. In response to each of the FOIA requests at issue, NMFS searched its Exxon Valdez Oil Spill records, all of which are located at either the Auke Bay Laboratory or the Exxon Valdez Oil Spill Office. *Id.* ¶ 8.

In its first letter (Request No. 2008-0046), Exxon requested all records related to the field work conducted for the Michel Study. In response to this request, NMFS's search located eight responsive records, which were released in their entirety to Exxon. Compl. Ex. M. Exxon subsequently appealed this response, which the Department of Commerce denied for timeliness reasons pursuant to agency regulations requiring that an appeal be received within 30 calendar days of the date of the written denial. *See* Compl. Ex. HH; 15 C.F.R. § 4.10(a).

In its second letter (Request No. 2008-00179), Exxon requested all data and documents related to the probability model developed for the Michel Study. A search of NOAA facilities revealed that there were no records responsive to this FOIA request. Compl. Ex. R. Exxon

subsequently appealed this response, which the Department of Commerce denied on the ground that the records sought by Exxon were not "agency records." *See* Compl. Ex. HH.

In its third letter (Request No. 2008-0331), Exxon requested all data and documents related to the field work and analyses conducted through the Boufadel Study. NMFS located five responsive records, which it released in their entirety to Exxon, accompanied by an index. Compl. Ex. V. Exxon subsequently appealed this response, which the Department of Commerce denied for timeliness reasons pursuant to agency regulations requiring that an appeal be received within 30 calendar days of the date of the written denial. *See* Compl. Ex. HH; 15 C.F.R. § 4.10(a).

In its fourth letter (Request No. 2009-00039), Exxon again requested all records related to the field work and analyses conducted pursuant to the Boufadel Study. NOAA responded that it had no records responsive to the request. Compl. Ex. Y. The Department of Commerce denied Exxon's appeal on the ground that the records sought by Exxon were not "agency records." *See* Compl. Ex. FF.

In its fifth letter (Request No. 2009-00040), Exxon again requested all data and documents related to the field work, analyses, and modeling developed for the Michel Study. In response, the Department of Commerce released five records found at Auke Bay Laboratory (four documents and a CD) in their entirety plus an index, determined to be responsive to Exxon's request. *See* Compl. Ex. T. The Department of Commerce denied Exxon's appeal of this response on the ground that the records sought by Exxon were not "agency records." *See* Compl. Ex. II.

### D. Plaintiff's FOIA Requests to EPA

By letter dated October 29, 2007 (Request No. HQ-RIN-00168-08), Exxon submitted a FOIA request to EPA seeking all records related to the Boufadel Study. In response, EPA released two draft reports and 26 e-mails responsive to this request and withheld a number of e-mails pursuant to the deliberative process privilege as incorporated in Exemption 5 of the FOIA, 5 U.S.C. 552(b)(5). Compl. Ex. Z, ¶ 6. Exxon appealed EPA's statement that it did not possess the Boufadel data, but did not appeal EPA's decision to withhold documents under Exemption 5. *Id.* ¶ 7. EPA denied the appeal, stating that "EPA does not possess and has never possessed the field work data." Compl. Ex. GG.

In another letter sent to EPA dated October 17, 2008 (Request No. HQ-RIN-00138-09), Exxon requested under FOIA all records related to a project being conducted by Dr. Venosa entitled "A Microcosm Study on the Biodegradability of Lingering Oil in Prince William Sound 19 Years After the Exxon Valdez Oil Spill" ("Venosa Project"). Compl. ¶ 55. EPA forwarded this request on to Dr. Venosa. In June 2010, EPA released responsive, non-exempt records that Dr. Venosa had located, withholding a number of records pursuant to the deliberative process privilege in Exemption 5 of FOIA. Defs.' Mot. for Summ. J. Ex. 6, ¶ 13. At the time that Exxon filed this Complaint against defendants, Exxon had not appealed EPA's response to its request for documents relating to the Venosa Project.

## II.   LEGAL STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining

whether a genuine issue of material fact exists, the trier of fact must view all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). In order to defeat summary judgment, a factual dispute must be capable of affecting the substantive outcome of the case and be supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242–43 (D.C. Cir. 1987). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[, and t]he moving party is entitled to judgment as a matter of law." *Celotext Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.  FOIA**

FOIA requires agencies of the federal government, upon request, to release records to the public. 5 U.S.C. § 552(a). The term "record," as defined in FOIA, includes "any information that would be an agency record subject to the requirements of [FOIA] when maintained by an agency in any format, including an electronic format," including any such information "that is maintained for an agency by an entity under Government contract, for the purposes of records management." 5 U.S.C. § 552(f)(2). A FOIA requester may appeal an agency's failure to disclose requested records. 5 U.S.C. § 552(a)(6). If the agency denies the request on appeal, the requester is deemed to have fully exhausted his administrative remedies and may bring suit in federal district court. 5 U.S.C. § 552(a)(6)(C)(i). A district court has jurisdiction to enjoin a federal agency from withholding information and order the production of any records that have been improperly denied to the requester. 5 U.S.C. § 552(a)(4)(B).

### III. ANALYSIS

#### A. Exhaustion of Administrative Remedies

Exhaustion of administrative remedies is a prerequisite to a lawsuit under FOIA "so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision." *See Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 61 (D.C. Cir. 1990). This means that a requester under FOIA must file an administrative appeal within the time limit specified in an agency's FOIA regulations or face dismissal of any lawsuit complaining about the agency's response. *See id.* at 65 n.9. The Department of Commerce's FOIA regulations require that an administrative appeal of an initial denial of a request for records be received within 30 days of the date of the written denial. 15 C.F.R. § 4.10(a).

Failure to exhaust available administrative remedies is a jurisprudential, not a jurisdictional, bar to judicial review. *Hidalgo v. FBI*, 344 F.3d 1256, 1259 (D.C. Cir. 2003). The exhaustion requirement thus precludes judicial review if the "'purposes of exhaustion' and the 'particular administrative scheme' support such a bar." *Id.* at 1258–59 (quoting *Oglesby*, 920 F.2d at 61). However, FOIA's administrative scheme "favors treating failure to exhaust as a bar to judicial review." *Hidalgo*, 344 F.3d at 1259. Therefore, where a FOIA plaintiff has not exhausted the available administrative remedies before filing suit in district court, dismissal of the complaint is warranted.

By letter dated September 5, 2008, Exxon submitted an appeal of the partial denial letters from the Department of Commerce dated December 18, 2007 (in response to Request No. 2008-0046) and July 18, 2008 (in response to Request No. 2008-0331). The Department of Commerce properly denied these appeals on timeliness grounds, as Exxon appealed these denials after the 30 day limit for appeals established by the agency regulations. *See* 15 C.F.R. § 4.10(a). Exxon

therefore failed to exhaust its administrative remedies with regard to these two claims before it filed suit in this Court.[1]  Furthermore, at the time that Exxon filed its Complaint on February 18, 2010, it had not exhausted its administrative remedies with regard to FOIA Request No. HQ-RIN-00138-09.  Exxon did not even file an administrative appeal of EPA's response to its FOIA request for documents relating to the Venosa Project until March 16, 2010, almost one month after filing its Complaint in this Court.  As the Court finds that Exxon failed to exhaust its administrative remedies with regard to FOIA Request Nos. 2008-0046, 2008-0331, and HQ-RIN-00138-09, the Court will not reach the merits of Exxon's arguments regarding these FOIA requests.

**B. FOIA**

The Court now turns to Exxon's appeals of the agency determinations regarding its remaining FOIA requests: 2008-00179, 2009-00039, 2009-00040, and HQ-RIN-00168-08.  "[T]he elements of a FOIA claim are (1) improperly (2) withheld (3) agency records." *Antonelli v. U.S. Parole Comm'n*, 619 F. Supp. 2d 1, 3 (D.D.C. 2009).  To qualify as "agency records" within the meaning of FOIA, requested materials must meet two criteria: (1) "an agency must either create or obtain the requested materials as a prerequisite to its becoming an agency record within the meaning of FOIA"; and (2) "the agency must be in control of the requested materials at the time the FOIA request is made." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144–45 (1989).

---

[1] Exxon argues that the failure to exhaust can be remedied where the plaintiff's first FOIA request was excused by subsequent requests for the same materials.  Under Exxon's theory, because it made subsequent requests that encompassed the records initially sought under Request Nos. 2008-0046 and 2008-0031, it is irrelevant whether its initial requests were timely appealed.  Exxon supports its theory by citing a case out of the District of Nevada in which the court declined to accept the theory that "the failure to appeal the first FOIA request should bar subsequent requests for the same material." *Nevada v. U.S. Dep't of Energy*, 517 F. Supp. 2d 1245, 1257 (D. Nev. 2007).  However, that authority is inapposite here and offers no support for Exxon's argument that administrative appeals can be aggregated to defeat the exhaustion requirement.

1.  *FOIA Requests to Department of Commerce*

First, the Court must determine whether the records Exxon requested from the Department of Commerce were created or obtained by the agency. *See Tax Analysts*, 492 U.S. at 144–45. The mere fact that a private researcher who created the requested records received federal funds to finance the research is insufficient to conclude that the data were "created or obtained" by the agency, but data produced by a private researcher may be considered agency records if the researcher was acting on behalf of the agency. *See Burka v. U.S. Dep't of Health and Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996). However, neither the Boufadel Study nor the Michel Study receives any funding from NOAA appropriations. Defs.' Mot. for Summ. J. Ex. 2, ¶ 11; Ex. 3, ¶ 10. Rather, all funding for the Boufadel and Michel Studies is derived from money transferred to NOAA from the $900 million civil settlement between Exxon and the Governments. NOAA has a limited, ministerial role in contracting with private organizations that are responding to proposals generated by and conducting research on behalf of the Trustee Council, rather than on behalf of one of the Trustee Council's trustee agencies. The Trustee Council—not NOAA—is responsible for soliciting project proposals, administering the proposal process, and developing workplans based on the funding recommendations. Defs.' Mot. for Summ. J. Ex. 2, ¶¶ 9–11; Ex. 3 ¶¶ 8–10. And although the COTR monitors the performance and progress of the contractor with respect to the statement of work and recommends payment of invoices to the NMFS Contracting Officer, the COTR does not have any substantive involvement in Trustee Council research projects. *See* Defs.' Mot. for Summ. J. Ex. 2, ¶¶ 14, 27. NOAA's position as one of the federal trustees on the Trustee Council does not change the fact that the Boufadel and Michel Studies were conducted by private researchers for the benefit of the Trustee

Council, and were not funded by nor conducted on behalf of one of the Trustee Council's trustee agencies.

Even assuming, *arguendo*, that the records requested from the Department of Commerce were "created or obtained" by the agency, NOAA does not meet the second criterion of the "agency records" analysis requiring that the agency "be in control of the requested materials at the time the FOIA request is made." *Tax Analysts*, 492 U.S. at 144–45. To determine whether an agency exercises sufficient control over a document to render it an "agency record," four factors must be balanced under a totality of the circumstances test: "(1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files." *Burka*, 87 F.3d at 515.

First, the Court will look at Dr. Boufadel and Dr. Michel's intent to retain or relinquish control over the records that Exxon requested. Under the Trustee Council Data Policy, "[d]ata acquired under Trustee Council funding is considered public information," and "[c]opyright to such data is owned by the State and/or Federal agencies sponsoring the project." Compl. Ex. K, at 3. However, one of the stated purposes of the Trustee Council Data Policy is to "protect the right of investigators who collect data, develop models, or who apply models to generate significant new insight to be cited whenever the data, models, or insights are used." *Id.* at 1. Even if *Burka*'s "control" test is constructive rather than actual—that is, even if it hinges on whether the researchers intend to turn over data to the agency, not on whether the researcher has already done so—the result is unclear here. Even though, pursuant to the Trustee Council Data Policy, Dr. Boufadel and Dr. Michel are obligated to relinquish control over their final reports to

13

the Trustee Council and copyright to those final reports is owned by NOAA as the project sponsor, this does not necessarily indicate an intent on the part of the researchers to relinquish control over their preliminary findings to NOAA. Under the Trustee Council Operating Procedures, Dr. Boufadel and Dr. Michel are not obligated to turn over to the Trustee Council the preliminary models and data that Exxon requested; rather, they will merely relinquish control over their final reports once their projects are complete, at which point the final reports will become public information. *See* Compl. Ex. G, at II-4. However, because the language used in the Data Policy merely refers to "[d]ata acquired under Trustee Council funding" and does not distinguish between preliminary data and final data for copyright purposes, it is unclear whether the researchers, by agreeing to abide by the Data Policy, effectively intended to relinquish control over their preliminary findings to the agency.

Second, the Court will examine NOAA's ability to use and dispose of the requested records as it sees fit. As noted above, it is uncertain whether the language in the Data Policy indicating that copyright to data acquired under Trustee Council funding refers to preliminary data or final reports. However, it is clear that the information Exxon sought to obtain through its FOIA requests was preliminary data that had not yet been turned over to the Trustee Council—or, for that matter, to NOAA. Accordingly, there is no indication from the parties' submissions that at the time of Exxon's FOIA request, NOAA had the ability to use any of the data that Exxon requested from the agency. Moreover, under the Trustee Council Data Policy, "all documents (including written, electronic, photographic, and magnetic) or physical evidence (such as tissue samples) produced or collected as part of any Trustee Council-funded project must be preserved, unless authorization is given by both the Alaska Department of Law and the

U.S. Department of Justice." Compl. Ex. K, at 2. This plainly demonstrates that NOAA has no ability to dispose of the requested records as it sees fit.

Third, the Court will analyze the extent to which NOAA personnel read or relied upon the requested documents. Although the Trustee Council obtained a summary of the status of the Boufadel and Michel Studies, this summary report was disclosed to Exxon, made publicly available, and posted on the Trustee Council website. *See* Defs.' Mot. for Summ. J. Ex. 3, at ¶ 17. There is no evidence that the NOAA Trustee read or relied upon the Boufadel and Michel data or reports, other than this summary report that has already been provided to Exxon. There is also no evidence that any other NOAA personnel, including any of the personnel at the Auke Bay Laboratory or the Exxon Valdez Oil Spill Office, read or relied upon the other Boufadel and Michel data or reports that Exxon seeks. "[W]here an agency has neither created nor referenced a document in the 'conduct of its official duties,' . . . the agency has not exercised the degree of control required to subject the document to disclosure under FOIA." *Judicial Watch, Inc. v. Fed. Hous. Fin. Agency*, 646 F.3d 924, 928 (D.C. Cir. 2011) (citation omitted).

Fourth, the Court will consider the degree to which the requested documents were integrated into NOAA's record system or files. Pursuant to the Trustee Council General Operating Procedures, a copy of each final project report "shall be placed in the Trustee Council's official record and at ARLIS (Alaska Resources Library & Information Services)." Compl. Ex. G, at II-4. The Trustee Council Data Policy mandates that all data and documentation acquired by principal investigators and their personnel through projects funded by the Trustee Council must be archived by the principal investigator in the Trustee Council's archive. *See* Compl. Ex. K, at 1–3. However, the Data Policy only requires principal investigators to archive their data and documents at the time of the submission of their final

15

project report to the Trustee Council office, at which point this information becomes public. *Id.* at 3. The requested documents therefore have not been integrated into NOAA's record system or files.

Although it is unclear whether Dr. Boufadel and Dr. Michel intended to retain control over the data request by Exxxon or relinquish control to the agency, when this is balanced with the other three factors in the "control" test, the totality of the circumstances establishes that NOAA was not in control of the requested materials at the time Exxon made the FOIA request. This, coupled with the Court's determination that NOAA did not create or obtain the requested materials, leads the Court to find that the requested records are not "agency records" of NOAA within the meaning of FOIA.

### 2. FOIA Requests to EPA

The records Exxon requested from EPA were created and maintained by private researchers funded by and acting on behalf of the Trustee Council, not the agency, and so they do not meet the first prong of the "agency records" analysis requiring that the agency "create or obtain" the materials being requested. *See Tax Analysts*, 492 U.S. at 144–45. Notably, although Dr. Venosa, (an EPA scientist) was listed on the Boufadel Project proposal, the extent of his involvement in the project stopped there. As proposed, the project was time-sensitive and required summer sampling. Defs.' Mot. for Summ. J. Ex. 7, ¶ 6. The project would have required the time-consuming drafting of a Category II quality assurance project plan (which establishes quality assurance requirements for important, highly visible agency projects involving areas such as supporting the development of environmental regulations or standards). Moreover, if the project had used Trustee funds and the funds came to EPA from the Trustees through an Interagency Agreement, then EPA would have had to adhere to lengthy government

contract regulations to get the funds to Temple University. Therefore, because his participation would have delayed the required summer sampling by at least a year, Dr. Venosa decided to remove himself and the EPA from the Boufadel Project subsequent to the submission of the proposal. *Id.* Instead, the Boufadel Project was funded directly with Temple University and Dr. Boufadel by the Trustee Council. *Id.* ¶ 7. Accordingly, EPA had no involvement in the Boufadel Project after the proposal stage, making clear that EPA did not create or obtain the requested materials and thus unquestionably fails to satisfy the first criterion of the "agency records" test. The Court thus sees no need to reach the question of whether EPA was in control of the requested materials at the time of the FOIA request and therefore holds that the requested materials are not "agency records" of EPA within the meaning of FOIA. [2]

### C. APA

Exxon also cited the Administrative Procedure Act, 5 U.S.C. ¶ 701, as a basis for jurisdiction over its FOIA claims. However, it is well established that the existence of an adequate remedy under FOIA precludes the availability of a plaintiff's APA claim. *See, e.g.*, *Bigwood v. Defense Intelligence Agency*, 699 F. Supp. 2d 114, 117–18 (D.D.C. 2010); *Feinman v. F.B.I.*, 713 F. Supp. 2d 70, 75–78 (D.D.C. 2010); *Kenney v. U.S. Dep't of Justice*, 603 F. Supp. 2d 184, 190 (D.D.C. 2009); *People for the American Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 308–09 (D.D.C. 2007); *Edmonds Inst. v. U.S. Dep't of the Interior*, 383 F. Supp. 2d 105, 111–12 (D.D.C. 2005). Exxon fails to present the Court with any explanation as

---

[2] Exxon presents evidence demonstrating that in the past, the Trustee Council required Exxon to submit its FOIA requests directly to the funding agencies responsible for scientific studies authorized by the Trustee Council. According to Exxon, the Trustee Council has required FOIA requests to go through the contracting agencies because the Trustee Council is not an independent entity, and therefore NOAA and EPA should be required to produce the requested records. However, the fact that Trustee Council representatives gave Exxon this guidance does not necessarily mean that it was correct, nor does it change the Court's analysis. As the Court has established, the requested records are not agency records of either NOAA or EPA within the definition of FOIA, regardless of where the Trustee Council advised Exxon to direct its FOIA requests.

to why its claim that the agencies allegedly improperly withheld documents cannot be adequately remedied under FOIA. Accordingly, Exxon's APA claims against defendants are dismissed.

### D. Mandamus

Exxon further cites the Mandamus Act, 28 U.S.C. § 1361, as a basis for jurisdiction over its FOIA claims. Although neither plaintiff nor defendants addressed this issue in their summary judgment motions, the Court will raise it *sua sponte*. The Mandamus Act states that "the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Mandamus relief is available only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005). As noted above, Exxon has an adequate remedy available under FOIA. Exxon's claims under the Mandamus Act are therefore dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that no genuine issue of material fact remains. The Court will therefore GRANT defendants' Motion for Summary Judgment and DENY plaintiff's Cross-Motion for Summary Judgment.


Signed by Royce C. Lamberth, Chief Judge, on December 8, 2011.